In the Matter of DAVID GLUCKSMAN, an Attorney.
In the Matter of MAX STEUER, an Attorney.

First Department, June 6, 1930.

*Isidor J. Kresel* of counsel [*Earl B. Barnes, Irving Ben Cooper* and *Sidney Lindner* with him on the brief], for the petitioners.

*Kopp, Markewich & Hull*; for the respondent.

DOWLING, P. J. The respondents are members of the bar of the State of New York. The respondent Glucksman was admitted to practice at a term of the Supreme Court of the State of New York, Appellate Division, Second Department, on December 5, 1912; and the respondent Steuer was admitted at a term of the Supreme Court of the State of New York, Appellate Division, First Department, on June 18, 1917. Since February 1, 1925, and during the period covered by the charges herein, the respondents practiced law as partners under the firm name of Glucksman & Steuer. Separate petitions were filed against them, but the charges are identical, and by stipulation the proceedings were treated as one.

The respondents are charged with misconduct as attorneys at law in the solicitation of negligence cases and with instituting actions without the knowledge, consent or authority of the plaintiffs named therein.

The matter is now before the court on a motion for such action as it may deem just and proper, following the filing of the report of the referee to whom the matter was referred to take testimony concerning the charges and report the same to this court with his opinion thereon.

The referee has found that the charge of solicitation has not been sustained. In his report he states: " Despite the fact that the respondent herein and his partner are comparatively young men they appear to have been more than ordinarily successful in securing substantial clients. * * * They claim to have represented in one way and another the following insurance companies and corporations:

" New Amsterdam Casualty Company
" The Red Cab Mutual Insurance Company
" The Independent Taxicab Owners Association
" The Cab Co. Insurance Company
" The Hartford Accident & Insurance Company
" The United States Fidelity & Guarantee Company
" The Union Indemnity Insurance Company
" The Ocean Accident Insurance Company
" The Independent Indemnity Insurance Company.
" The Greater New York Taxpayers Association and
" The Yellow Taxicab Corporation of New York.

" In certain of these clients, they represented them as attorneys of record, in some instances in actions in the Municipal Court, and in certain instances, they appeared to have represented them in actions brought directly by these companies wherein certain of these clients were entitled to be subrogated to the rights of the injured. It is important to call particular attention to the fact

that for some period of time these respondents represented the Yellow Taxicab Corporation. It is probably true that every accident to a taxicab resulted in two causes of action and sometimes is responsible for a third, to wit, there is a claim for property to the cab, there is a claim for personal damages by the chauffeur and not infrequently there is a claim for personal damages on behalf of the passenger. It appears that in very many instances the chauffeurs of cabs that were insured when they made their report to their superior officers were told to take the matter to these respondents who were their [the cab company's] attorneys and that by reason of that the chauffeur was quite likely to give to the respondents his personal claim; that in this way the respondents were known as the attorneys for the Cab Company and this fact was known to most of the chauffeurs and that these chauffeurs undertook, at one time and another, to recommend the respondent's firm as lawyers who would look after passengers in the event that they had a claim and it is probably true that what applies to the Yellow Taxicab Corporation also applies to certain others of the compaines which at one time and another were represented by these respondents. This explanation becomes important, therefore, because of the fact that it would otherwise be difficult to understand how these respondents became counsel in so many cases. It almost challenges the credulity of one to understand how these respondents could have been the attorneys for 5181 claimants or plaintiffs in that number of cases instituted by these plaintiffs between the first day of January, 1925, and the 31st day of December, 1927, in the Second District Municipal Court, Borough of Manhattan, and were it not for the facts above set forth inferences of solicitation must be indulged in."

The record shows that in the year 1926 the respondents handled 6,000 cases for the Yellow Taxicab Corporation, 4,000 of which were suits and 2,000 claims. In the same year they had charge of from 3,000 to 4,000 cases for the Manufacturers Liability Insurance Company, as well as claims for other companies. Since the formation of the partnership up to May, 1929, their deposits were from $600,000 to $750,000.

Before Mr. Justice WASSERVOGEL, in the Ambulance Chasing Investigation, witnesses gave testimony of solicitation. Before the referee these same witnesses reversed their testimony and attributed their retaining respondents to the intervention of friends or acquaintances. The referee in his report states: " In most cases this is to be attributed to the witnesses having refreshed their memories by asking friends about it." This situation warrants the inference that these witnesses were willing to change their testimony.

Evidence is lacking that respondents are responsible for such change.

Respondents had in their employ one " Joe " Cappagrosso. Their testimony is that he was an investigator. Petitioners contend he was a " runner." One Frank DiGicomo retained respondents through Cappagrosso. His claim was settled and in December, 1927, he received from respondents his share of the settlement. In March, 1928, he received from respondents a letter asking him to " come down at once." The Ambulance Chasing Investigation was then in progress. DiGicomo was subpœnaed in that investigation. Respondent Steuer's testimony is that the object of their letter to DiGicomo was to find employment for one Belardo. DiGicomo did not remember the name Belardo and could not recall Steuer's saying anything about a job for Belardo. DiGicomo testified Steuer cautioned him not to mention Cappagrosso's name, lest he put Cappagrosso in trouble for nothing. Steuer's testimony is that DiGicomo inquired whether he should mention Cappagrosso at the hearing and Steuer said: " Yes, tell them it was Cappagrosso who originally sent you to me," and " Explain how it is, explain how long you have known the man, and how you met him and how you happened to talk to him about the case." Respondents' letter to DiGicomo just at the time he was subpœnaed is more than a coincidence. Apparently something was sought to be concealed, although DiGicomo's testimony concerning his retention of respondents would not indicate that he had been solicited by Cappagrosso and would seem to bear out the contention that Cappagrosso was, in fact, an investigator. Petitioners' contention that he was a " runner " is not sustained by the evidence.

There is evidence of a practice existing in the respondents' office of instituting actions without direct authority of the claimants. Both respondents sought to minimize the evil of this by testifying that nobody was harmed and no harm was intended. Evidence was produced of three instances of such practice.

Bertha Siegel was the owner of an automobile. She and her husband, Abraham Siegel, and one Joe Tucker and Tucker's wife were riding in her automobile when they met with an accident. Actions were commenced by respondents in the name of both Mr. and Mrs. Siegel. Mrs. Siegel testified that she never knew a suit was brought in her name, and that she never employed respondents to act for her. Her husband also testified that he never employed any lawyer for his wife. Respondent Glucksman testified that Tucker came down to them and gave them the case on behalf of Mr. and Mrs Siegel. Neither of the Siegels recalls authorizing Tucker to take the case to respondents. There is testimony

that Tucker said he had somebody who would attend to it. There is lacking convincing proof of authorization of a retainer in this matter.

Joseph Kaplan was in an automobile accident around Christmas time, 1925. He adjusted his claim himself with the adjuster for the Third Avenue railway. Respondents instituted a suit in his name. The summons was dated January, 1926. This suit was dismissed in June, 1929, for failure to prosecute. Respondent Steuer's testimony is that Mike Glassman, who was riding with Kaplan, retained them to sue on his behalf and also told them to take care of the case of Kaplan. Kaplan gave the name of the man with him as Garvey, but was under the impression that it was a nickname. However, Kaplan did not authorize any one to retain a lawyer for him.

There is also proof that respondents prosecuted a claim of one Rosenbaum without being retained.

Speaking of these matters, the referee said: " The respondents never saw the clients, had no retainer; of course, knew nothing as to the extent of the injury to person or property, and had no facts upon which to base the actions, except as retailed to them by a third party."

Respondents represented one Edward Cooper. Cooper was involved in an accident while operating a cab. Cooper claimed he owned the cab, but it was registered in the name of Rosenbaum, from whom Cooper claims he bought it and continued the Rosenbaum registration to save a fee. Respondents being apprised of this, said the property damage suit would have to be in the name of Rosenbaum, whereas the personal injury suit could be in Cooper's name. Rosenbaum did not appear at the hearings in this matter, either before Mr. Justice WASSERVOGEL or before the referee. Cooper's testimony is that he never executed the release nor indorsed the check for his share of the settlement. Respondents' testimony is that a stranger came into their office, following notification to Cooper that the suit was settled, represented himself to be Cooper, was introduced " by the office " to a commissioner of deeds and executed the release. Cooper's testimony is that he owed Rosenbaum a balance on the cab; his testimony would indicate that Rosenbaum got the proceeds of the settlement checks and may have been the person who executed the release in Cooper's name. In any event, no question is raised by Cooper as to his share of the settlement. The referee in his report states: " From the above testimony it appears that a release purporting to bear Cooper's signature was prepared in the office of the respondents and that it was executed by some unknown person in their office before a Commissioner of Deeds who had an office in their suite.

"While the testimony as to the moneys that were paid by the respondents under the two checks in settlement of these two cases is somewhat unsatisfactory, we have no reason to believe that the money did not go to either Rosenbaum or Cooper — in other words, there is no evidence at all which would even indicate that the respondents took the moneys which properly belong to Rosenbaum and Cooper."

This situation is typical of many others. There is testimony of a looseness of practice concerning settlements which is amazing. No care was taken to see that the releases were executed by the individuals named therein. Indorsements on checks were accepted without attempting to verify that such indorsements were made by the payees.

There is testimony of negotiations for settlement of cases on a lump sum basis. One adjuster testified he told one of the respondents that in cases where he had made a small offer he did not mind taking twenty-five dollars more on one release providing respondents took it off in another case, with the understanding that the sum total in all the cases did not exceed the named figure. Respondents' testimony is that no offer of settlement was accepted without first communicating with the client.

Respondents brought the majority of the actions in which they were retained in the Municipal Court of the City of New York, Borough of Manhattan, Second District. There is testimony in the record that in nine out of ten of such actions the respondents failed to indorse on the summonses the addresses of the plaintiffs. In disregard of the provisions of the Municipal Court Code respondents cluttered up the calendars of this District Court without endeavoring to see that actions were instituted in their proper district.

There is also proof that in a great many instances where suits were either settled or discontinued, respondents made no effort to see that such suits were removed from the court calendar, leaving that matter entirely to the defendants' attorneys.

There is in this record no evidence of fraud on the part of respondents. There is no evidence that any client suffered pecuniary loss as the result of any act of the respondents. The record establishes, however, that respondents viewed the practice of the law not as a profession but as a business. The enormous volume of business which the record discloses was conducted with a paucity of business records which is a matter of wonderment. During the years 1925, 1926 and 1927 no register was kept. Their books consisted of a check book, some card indexes of "live" and "dead" cases, and a separate folder or envelope for each case. The rules adopted

by this court as a result of the Ambulance Chasing Investigation will prevent a recurrence of this lack of proper record. This court has condemned the bringing of suits without proper retainers (See *Matter of Cohen,* 228 App. Div. 465), and has repeatedly expressed itself on the subject of lack of care attending the execution of releases. (See *Matter of Hendrick,* 229 App. Div. 100; *Matter of Weinstein,* 228 id. 210.)

We are unable to understand how any member of the bar can feel that he is properly discharging his duty to his client when he engages in the bartering of releases for a lump sum. When an attorney accepts a retainer to prosecute a claim, no matter how small, on behalf of a client, he is violating the ethics of his profession when he treats the interests of his clients as a commodity to be dealt in in bulk form. The Fifteenth Canon of Professional Ethics reads, in part, as follows: " The lawyer owes ' entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied." The trading of so many releases for a fixed sum, to be distributed as the attorney thinks best, leads inevitably to the situation where some client has failed to receive the consideration which the merits of his case warranted. Proof of participation in this practice merits rebuke.

The calendars of all the courts in this department have been the subject of much concern on the part of all those interested in the administration of justice. The Committee on Congestion of Calendars in the First Department has been laboring for over three years in an endeavor to improve conditions. In the Municipal Court of the City of New York, Borough of Manhattan, Second District, as the result of the recent action taken by the president justice on the recommendation of the Committee on Congestion of Calendars, requiring the filing of an affidavit before a given date setting forth why each action should not be dismissed, cases were dropped from the calendar as follows: For the year 1927 approximately 7,430 and for 1928 approximately 6,320. The tactics of the respondents, bringing actions in this district when they did not properly belong there, and in failing to see that cases were not permitted to remain upon the calendar after they had been settled or discontinued, contributed in no small degree to the congestion of the Second District Court calendars. Very little lasting improvement can be made in calendar conditions without the co-operation of members of the bar. Every attorney should see to it that actions are brought in the venue where they belong, and should also see to it that actions are promptly removed from the calendars when they

have been either settled or discontinued. This applies with equal force to attorneys regardless of which party they may represent.

For the method in which respondents conducted their business, though we find no proven instance of fraudulent or corrupt practices, the respondents should be severely censured.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondents severely censured.